**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2149
_____

REGINALD KIRTZ,
                                        Appellant

v.

TRANS UNION LLC;
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE
AGENCY,
doing business American Education Services;
UNITED STATES DEPARTMENT OF AGRICULTURE
RURAL DEVELOPMENT RURAL HOUSING SERVICE

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-20-cv-05231
District Judge:  The Honorable Mitchell S. Goldberg

_____

Argued May 24, 2022

Before: KRAUSE, BIBAS, and PHIPPS, *Circuit Judges*

(Filed: August 24, 2022)

Nandan M. Joshi [ARGUED]
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009

Matthew B. Weisberg
Weisberg Law
7 South Morton Avenue
Morton, PA 19070

     *Counsel for Appellant*

Mark B. Stern [ARGUED]
Sarah W. Carroll
United States Department of Justice
Civil Division, Appellate Staff
Room 7511
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*

There are profound implications to throwing open the doors to the United States Treasury, so before we do, we need to be sure that is what Congress intended. Here, the District Court dismissed Appellant Reginald Kirtz's lawsuit against the U.S. Department of Agriculture ("USDA") for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*, because it concluded the statute did not clearly waive the United States' sovereign immunity. The

District Court was in good company, as the Courts of Appeals to have considered this issue are split down the middle, and until today, we had not yet spoken. But our best indicator of Congress's intent is the words that it chose, and in our view, the FCRA's plain text clearly and unambiguously authorizes suits for civil damages against the federal government. In reaching a contrary conclusion, the District Court relied on its determination that applying the FCRA's literal text would produce results that seem implausible. That may be, but implausibility is not ambiguity, and where Congress has clearly expressed its intent, we may neither second-guess its choices nor decline to apply the law as written. Accordingly, we will reverse and remand to the District Court for further proceedings.

I.

In 1970, Congress enacted the FCRA to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). As originally enacted, the FCRA imposed substantive requirements on consumer reporting agencies and "persons" who used information in credit reports. *See* Pub. L. No. 91-508, §§ 604-615, 84 Stat. 1114, 1129-33 (1970) ("1970 Act"). The 1970 Act also expressly defined the term "person" as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." *Id.* § 603(b).

In 1996, Congress amended the FCRA to impose new requirements on "persons," such as creditors and lenders, who furnish information to credit reporting agencies. *See* Consumer Credit Reporting Reform Act of 1996, Pub. L. No.

3

104-208, § 2413, 110 Stat. 3009, 3009-447 to -449 ("1996 Amendments"). One such set of requirements is triggered when consumers contact a consumer reporting agency to dispute the accuracy of information in their credit file under § 1681i(a)(1)(A) of the FCRA. The consumer reporting agency is required to send notice of the dispute to "any person who provided any item of information in dispute"—that is, to the furnisher of the information. 15 U.S.C. § 1681i(a)(2)(A). When a furnisher receives such notice from a consumer reporting agency, it must "conduct an investigation with respect to the disputed information," "modify," "delete," or "block the reporting of" any information found to be inaccurate, and "report the results of the investigation" to both the consumer reporting agency that provided notice and, "if the investigation finds that the information is incomplete or inaccurate," to "all other consumer reporting agencies" to which the furnisher provided the disputed information. *Id.* § 1681s-2(b)(1).

If a furnisher of information negligently fails to comply with these requirements—or any of the FCRA's other substantive requirements—§ 1681o authorizes consumers to bring an action for actual damages, costs, and attorney's fees. If the failure to comply is willful, § 1681n further provides for statutory and punitive damages. When §§ 1681n and 1681o were originally enacted in 1970, they imposed liability only on consumer reporting agencies and users of information, *see* Pub. L. No. 91-508 at §§ 616-17, but when Congress expanded the FCRA's substantive requirements in the 1996 Amendments it also expanded these sections to authorize suits against "[a]ny person" who fails to comply with "any requirement" under the Act, 15 U.S.C. §§ 1681n(a), 1681o(a).

4

This appeal arises from two loans issued to Reginald Kirtz, one by the Pennsylvania Higher Education Assistance Agency ("AES"), a "public corporation" authorized under Pennsylvania law to make, guarantee, and service student loans, 24 Pa. Stat. and Cons. Stat. §§ 5101, 5104(1), and the other by the USDA through the Rural Housing Service, which issues loans to promote the development of safe and affordable housing in rural communities. Kirtz alleges that, as of June 2018, both of his loan accounts were closed with a balance of zero. Despite this, AES and the USDA continued to report the status of Kirtz's accounts as "120 Days Past Due Date" on his credit file from Trans Union LLC, resulting in damage to his credit score. Pursuant to § 1681i(a)(1)(A) of the FCRA, Kirtz sent a letter to Trans Union disputing the inaccurate statements on his credit file, and Trans Union gave notice of the dispute to both AES and the USDA per § 1681i(a)(2)(A). According to Kirtz, however, neither AES nor the USDA took any action to investigate or correct the disputed information, in violation of § 1681s-2(b)(1).

Kirtz commenced this action against Trans Union, AES, and the USDA on October 20, 2020, alleging both negligent and willful violations of the FCRA under §§ 1681n and 1681o.[1] Both AES and Trans Union filed answers to Kirtz's

---

[1] Specifically, Kirtz alleged that AES and the USDA failed to comply with the duties the FCRA imposes on furnishers of information under § 1681s-2(b)(1), and that Trans Union failed to comply with the duties the FCRA imposes on credit reporting agencies to ensure the accuracy of the information contained within credit reports under §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(5).

Amended Complaint, but the USDA responded by filing a motion to dismiss for lack of subject matter jurisdiction based on the United States' sovereign immunity.[2] *See* Fed. R. Civ. P. 12(b)(1). The District Court agreed with the USDA that §§ 1681n and 1681o did not unequivocally express Congress's intent to waive sovereign immunity and granted the USDA's motion to dismiss. Applying the statutory definition of "person" to the civil liability provisions, the Court reasoned, would require doing so throughout the FCRA, leading to certain results that seemed implausible. Thus, the Court rejected that reading, even recognizing those provisions authorize suits against "[a]ny person," and § 1681a(b) expressly defines "person" to include any "government or governmental subdivision or agency."

## II.

Kirtz originally invoked the District Court's jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331. We have

---

[2] Though AES was established by the Pennsylvania Legislature as "a public corporation and government instrumentality," 24 Pa. Stat. and Cons. Stat. § 5101, it is not supported by tax revenue, is controlled by a largely autonomous board of directors, and would be responsible for paying any civil judgment against it from its own funds, rather than those of the Commonwealth, *see id.* at §§ 5104(3), 5105.10. For these reasons, some courts have expressed doubt as to whether AES shares Pennsylvania's sovereign immunity from suit. *See, e.g.*, *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 650 (4th Cir. 2015). Because AES did not move to dismiss on sovereign immunity grounds, however, the District Court did not consider that issue, and it is consequently not implicated in this appeal.

6

jurisdiction under 28 U.S.C. § 1291. We review the District Court's legal conclusion that the FCRA does not waive the federal government's sovereign immunity *de novo*. *See Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018).

The sole question at issue in this appeal is whether §§ 1681n and 1681o of the FCRA waive the USDA's sovereign immunity. We have not addressed this question, but four other Courts of Appeals have. The District Court aligned itself with the Fourth and Ninth Circuits, which concluded that the United States is not subject to liability under the FCRA. *See Robinson v. United States Dep't of Educ.*, 917 F.3d 799 (4th Cir. 2019); *Daniel v. Nat'l Park Serv.*, 891 F.3d 762 (9th Cir. 2018). The D.C. and Seventh Circuits, on the other hand, have reached the opposite conclusion, holding that the FCRA's plain language indeed waives the United States' sovereign immunity. *See Mowrer v. United States Dep't of Transp.*, 14 F. 4th 723 (D.C. Cir. 2021); *Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014). For the reasons that follow, we agree with the reasoning of the D.C. and Seventh Circuits and hold that §§ 1681n and 1681o unequivocally waive the sovereign immunity of the United States.

A.

The United States and its agencies—including the USDA—enjoy sovereign immunity from suit, but Congress may waive that immunity by enacting a statute that authorizes suit against the government for damages or other relief. *See FAA v. Cooper*, 566 U.S. 284, 290–91 (2012); *Doe 1 v. United States*, 37 F.4th 84, 86–88 (3d Cir. 2022). Whether a statute waives sovereign immunity is a question of statutory interpretation. Any waiver must be "unequivocally expressed" in the statutory text, *Sossamon v. Texas*, 563 U.S. 277, 284

(2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)), but "Congress need not state its intent in any particular way" and is "never required" to use "magic words" to waive immunity, *Cooper*, 566 U.S. at 291. Rather, if, after applying the "traditional tools of statutory construction," there is "no ambiguity," courts must apply a waiver as written, *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 590 (2008), and may not "narrow [a] waiver that Congress intended," *United States v. Idaho ex rel. Dir., Idaho Dep't of Water Res.*, 508 U.S. 1, 7 (1993) (internal quotation marks omitted).

On the other hand, if the waiver *is* ambiguous—meaning the language Congress purportedly used to waive immunity is reasonably susceptible to more than one meaning—then the sovereign immunity canon requires courts to construe that ambiguity in favor of immunity. *See Cooper*, 566 U.S. at 290.

Importantly, while we speak of Congress's "intent" to waive sovereign immunity, our inquiry is limited the statutory text. Legislative history may neither supply a waiver that is not present in the text nor destroy one that is. *See Lane v. Pena*, 518 U.S. 187, 192 (1996). Instead, if a waiver is "clearly discernable from the statutory text in light of traditional interpretive tools," we must give effect to it. *Cooper*, 566 U.S. at 291. For the reasons that follow, we hold that §§ 1681n and 1681o of the FCRA satisfy this standard.

B.

1.

8

The FCRA provides that any "person" who either negligently or willfully "fail[s] to comply with any requirement imposed under [the FCRA] with respect to any consumer is liable to that consumer" for civil damages. 15 U.S.C. §§ 1681n(a), 1681o(a). The FCRA also expressly defines the term "person" to include any "government or governmental subdivision or agency." *Id.* § 1681a(b). The term "person" is usually presumed to not include the sovereign. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780–81 (2000). But that presumption only applies "[i]n the absence of an express statutory definition[.]" *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1861-62 (2019). And here, the FCRA contains such an express definition: it defines "person" to include any "government or governmental subdivision or agency." 15 U.S.C. § 1681a(b).

This definition, moreover, explicitly applies "for purposes of this subchapter," *id.* at § 1681a(a), meaning subchapter III of chapter 41 of Title 15, containing the entirety of the FCRA, including both its substantive requirements and its enforcement provisions, *see id.* §§ 1681–1681x. Indeed, where Congress wanted to use a different or narrower definition of "person" within the FCRA, it knew how to do so: § 1681g, for example, imposes certain disclosure obligations on "[a]ny person who makes or arranges loans and who uses a consumer credit score," 15 U.S.C. § 1681g(g)(1), but that section explicitly excludes from the FCRA's definition of "person" any "enterprise" as defined in a separate statute, *id.* § 1681g(g)(1)(G). We presume, therefore, that Congress's failure to do so in §§ 1681n and 1681o was deliberate and intended to convey the full statutory definition. And that presumption is buttressed by the fact that § 1681n clearly distinguishes between "natural person" and the statutorily-

9

defined term "person." *See id.* § 1681n(a)(1)(B), n(a). Together, these statutory provisions demonstrate that Congress intended for the term "person" in the civil liability provisions to carry its expressly defined meaning, rather than a narrower or a colloquial meaning.

Nor is there ambiguity about whether that express definition—covering "any . . . government or governmental subdivision or agency"—encompasses the United States and its agencies, including the USDA. *Id.* § 1681a(b). As a general matter, Congress uses the expansive modifier "any" to bring within a statute's reach all types of an item. *See, e.g.*, *Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–220 (2008). That it intended as much here is apparent from § 1681a(d)(2)(D), which excludes from the definition of "consumer report" any communications "described in" § 1681a(y),[3] which relates, inter alia, to employment-based communications that are "not provided to any person except . . . any Federal or State officer, agency, or department," 15 U.S.C. § 1681a(y)(1)(D)(ii). Were federal agencies and departments already excluded from the FCRA's definition of "person," there would be no need for these carve-outs.

Likewise, § 1681b(b)(3)(A) imposes obligations on "person[s]" who make adverse employment decisions based on credit reports but makes an exception "[i]n the case of an agency or department of the United States Government" if that

_____

[3] Due to a drafting error, § 1681a(d)(2)(D) actually refers to § 1681a(x), but the accompanying notes make clear that the reference should be to subsection (y). *See* 15 U.S.C. § 1681a note (References in Text Notes).

10

agency or department makes certain written findings. *Id.* § 1681b(b)(4)(A). Again, this exception would be entirely superfluous if federal agencies and departments were not otherwise included as "persons" within the FCRA's definition.[4]

Even the Fourth and Ninth Circuits, though ultimately concluding that Congress did not waive the United States' sovereign immunity, do not dispute that the United States must

---

[4] Other examples abound. For example, the FCRA only permits credit reporting agencies to furnish credit reports in six circumstances "and no other:" (1) pursuant to a court order; (2) pursuant to the written instructions of the consumer; (3) to "person[s]" whom the credit reporting agencies believe intend to use the information for specified purposes; (4) in response to a request from the head of a state or local child support agency; (5) to an agency administering a State child support plan; and (6) to the Federal Deposit Insurance Corporation or the National Credit Union Administration pursuant to applicable federal law. 15 U.S.C. § 1681b(a)(1)–(6). If the United States and its agencies were not "persons," within the FCRA's definition, credit reporting agencies would not be able to legally provide them with credit reports. Similarly, when a consumer disputes the accuracy of information in a credit report, § 1681i only requires credit reporting agencies to provide notice of disputes to "persons" who furnished the disputed information. *Id.* § 1681i(a)(2). Reading the government out of the definition of "person" would thus eliminate the sole means by which the FCRA allows consumers to dispute information furnished by the nation's largest employer and creditor.

11

be a "person" for purposes of the FCRA's substantive requirements;[5] rather, they draw a distinction between the Act's substantive and enforcement provisions. *See Robinson*, 917 F.3d at 806; *Daniel*, 891 F.3d at 773. But that distinction is wholly artificial. The FCRA could not be clearer that its definitions apply to the entire subchapter, *see* 15 U.S.C. § 1681a(a), and there is nothing in the text of the FCRA's civil liability provisions nor its other enforcement provisions to the contrary. Nor do these courts cite any authority to support such a departure from the statutory text.

In sum, we agree with the Seventh and D.C. Circuits that the plain text of the statute operates as a waiver of sovereign immunity: "[O]nce it is conceded that 'any . . . government' includes the United States . . . there is no basis for denying that the same definition governs FCRA's private damages actions."[6] *Mowrer*, 14 F.4th at 730.

---

[5] The United States itself conceded that it was a "person" within the FCRA's definition in *Bormes*, although it did not do so in *Robinson* or *Daniel*. *Compare Bormes*, 759 F.3d at 795, *with Robinson*, 917 F.3d at 806, *and Daniel*, 891 F.3d at 773.

[6] The USDA suggests that, in order to waive sovereign immunity, Congress may not simply define a term like "person" to include the government in a general definitional section and then use that term in a later liability section, but that it must instead authorize suit against the government in the liability section itself. The Supreme Court, however, has "never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time[.]" *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 76 (2000).

12

2.

Our reading of the FCRA's plain text is reinforced by a comparison with the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, both of which are codified alongside the FCRA in Chapter 41 of Title 15. Like the FCRA, the TILA and ECOA define "person" to include any "government or governmental subdivision or agency," and each includes "person" in its definition of the term "creditor." *See* 15 U.S.C. §§ 1602(d)–(g), 1691a(e)–(f). Both statutes also authorize suits for civil damages against any "creditor" who violates their substantive requirements, using nearly identical language to the FCRA's civil liability provisions. *Compare* 15 U.S.C. § 1640(a) ("[A]ny creditor who fails to comply with any requirement imposed under [the TILA] . . . with respect to any person is liable to such person . . . ."), *and* 15 U.S.C. § 1691e(a) ("Any creditor who fails to comply with any requirement imposed under [the ECOA] shall be liable to the aggrieved applicant . . . ."), *with* 15 U.S.C. § 1681n(a) ("Any person who willfully fails to comply with any requirement imposed under [the FCRA] with respect to any consumer is liable to that consumer . . . .").

The surrounding statutory context of each statute confirms that Congress understood the use of the defined term "person" to signal an unambiguous waiver of sovereign immunity. The TILA, for example, includes a provision that expressly preserves the United States' sovereign immunity against civil suits. *See* 15 U.S.C § 1612(b); *see Moore v. United States Dep't. of Agriculture*, 55 F.3d 991, 994 (5th Cir. 1995). Similarly, while the ECOA also authorizes punitive damages against "creditors," it expressly exempts any "government or governmental subdivision or agency." 15

13

U.S.C § 1691e(b).  As these examples make plain, Congress understood in the contexts of the TILA and ECOA that authorizing suits against "any creditor"—*i.e.*, any "person"— would otherwise suffice to waive sovereign immunity,[7] and legislated against that statutory background when it enacted the 1996 FCRA Amendments.[8]  Indeed, since 1996, Congress has amended the FCRA to expressly incorporate the ECOA's definition of "creditor," and thus its definition of "person." *See* 15 U.S.C. § 1681a(r)(5) (1998).  These statutory parallels and cross-references provide additional evidence that the FCRA authorizes civil damages against "any person," without any exemption for the United States government.

3.

---

[7] In distinguishing the ECOA waiver, the District Court stressed that neither of the FCRA's civil liability provisions contains an exemption for government entities similar to that found in § 1691e(b).  But the inference is the exact opposite: It is the express authorization of suits against "any creditor" in § 1691e(a) that waives sovereign immunity, not the government exemption in subsection § 1691e(b), which merely confirms the existence of the waiver.  Put another way, if Congress eliminated subsection (b) tomorrow, the waiver in subsection (a)—which is nearly identical to the FCRA's waiver—would remain clear and unambiguous.

[8] The civil liability provision of the TILA was enacted in 1980 and the relevant provision of the ECOA in 1991.  And by 1996 at least one Court of Appeals had already interpreted the ECOA to unambiguously waive the United States' sovereign immunity.  *See Moore*, 55 F.3d at 994.

14

The USDA challenges our interpretation by pointing to the original 1970 version of the FCRA, which also defined "person" to include the government but did not impose civil liability on "persons"—only on "consumer reporting agenc[ies] [and] user[s] of information." Pub. L. No. 91-508 at §§ 616-617. The USDA argues that the FCRA's definition of "person" could not have waived the United States' sovereign immunity in 1970 and that there is nothing in the text or legislative history of the 1996 Amendments to signal a change in Congress's intent. This argument, however, ignores Congress's decision to extend civil liability under the 1996 Amendments beyond consumer reporting agencies and users of information to "persons," a term expressly encompassing the United States and thus signaling a waiver of sovereign immunity absent an exemption.

We also take issue with the USDA's premise. The 1970 Act imposed civil liability on all "user[s] of information" who violated its requirements, and while the statute did not expressly define "user[s] of information," it did prohibit consumer reporting agencies from providing credit reports except to "person[s]" whom the agency had reason to believe would "use the information" for specified purposes. Pub. L. No. 91-508 at §§ 604(3), 616-617. If only "person[s]" could be "users of information," then the 1970 Act's civil liability provisions would appear to authorize suit against any "person" who uses credit information, including the United States.[9]

---

[9] The Seventh and D.C. Circuits have also suggested that the 1970 Act may have waived the United States' sovereign immunity. *See Mowrer*, 14 F. 4th at 730 n.1; *Bormes*, 759 F.3d at 795. The Ninth Circuit, however, rejected this reading based on the fact that the 1970 Act only imposed

15

In any event, even if the USDA is correct that the 1970 Act did not waive sovereign immunity, we are focused today on interpreting the 1996 Amendments, and those Amendments, in clear and unambiguous terms, authorize suits against all "persons," including the United States.

4.

We also find it significant that, in addition to imposing liability on "any person," Congress also authorized suits for failure to comply with "any requirement imposed under [the FCRA] with respect to any consumer[.]" 15 U.S.C. §§ 1681n(a), 1681o(a). As previously discussed, the United States is subject to the FCRA's substantive requirements as both a furnisher and a user of credit information, *see id.* §§ 1681s-2, 1681b(b)(3), so even if the FCRA did not expressly impose liability on the United States as a "person," the plain text would appear to authorize suit for violations of "any requirement" to which the FCRA subjects the United States.

This reading finds support in the Supreme Court's decision in *Lane v. Pena*, 518 U.S. 187 (1996). In that case, the Court considered a provision of the Rehabilitation Act of 1973 that authorized civil damages "to any employee or applicant for employment" aggrieved by an employer's response to an EEOC complaint. 29 U.S.C. § 794a(a)(1). Though that provision never references the United States government nor any defined term like "person," the Rehabilitation Act expressly allows employees to file EEOC

_____

criminal liability on "persons." *See Daniel* 891 F.3d at 775 & n.12. It does not appear to have considered that only "persons" could be "user[s] of information" under the 1970 Act.

complaints against federal agencies. *See id.* § 791(f). Based on this and § 794a(a)(1)'s "broad language" encompassing "any complaint," the Supreme Court held that the provision expressly waived federal agencies' sovereign immunity. *Lane*, 518 U.S. at 193. In contrast, a different provision of the Rehabilitation Act that imposed liability only on a narrow class of defendants who were "recipient[s] of Federal assistance or Federal provider[s] of such assistance" did not speak broadly enough to waive federal sovereign immunity. *Id.* at 192–93 (quoting 29 U.S.C. § 794a(a)(2)).

The same is arguably true here, where the FCRA both imposes requirements on the United States and authorizes civil damages for failure to comply with "any requirement." We need not now decide, however, if the FCRA's "any requirement" language would suffice on its own, as in *Lane*, to effect a waiver of sovereign immunity. For today's purposes, it is enough to observe that Congress's use of such broad language lends further support to our reading.

5.

In the face of the FCRA's clear text, the USDA tells us to look instead to the statute's legislative history. Our inquiry, however, is limited to ascertaining Congress's intent as expressed in the text, and "[l]egislative history generally will be irrelevant to a judicial inquiry into whether Congress intended" to waive sovereign immunity. *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989). For the reasons we have laid out, the FCRA's text is clear, and legislative history cannot create ambiguity where there is none. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020).

17

Moreover, even if the legislative history put forward by the USDA were relevant, it would not be persuasive. The USDA provides no evidence that Congress sought to preserve the federal government's immunity; instead, it offers scattered references by members of Congress to *private* furnishers of credit information, such as banks and businesses, and asks us to infer from Congress's silence as to *public* furnishers its intent to exclude them from civil liability.[10] But Congressional silence can hardly be said to speak loudly, particularly when viewed alongside clear statutory text.[11] Moreover, as Kirtz points out, the USDA's reliance on Congressional silence would also mean that the federal government, because it was

---

[10] The USDA also urges us to consider the Congressional Budget Office's analyses of antecedent versions of the FCRA, none of which anticipated significant government liabilities. *Cf. Daniel*, 891 F.3d at 775–76. But the "CBO is not Congress," *Sharp v. United States*, 580 F.3d 1234, 1239 (Fed. Cir. 2009), and its expertise is calculating costs, not statutory interpretation; its views are thus immaterial to our analysis.

[11] This was not always so. As the USDA points out, the Supreme Court has in the past been willing to disregard a clear and unambiguous waiver of immunity based solely on silence in the Congressional record. *See* Appellees' Br. at 17 (citing *Emps. of the Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 282–87 (1973)). That era, however, has long since passed, and today's precedent makes clear that our analysis must begin and end with the text. *See Cooper*, 566 U.S. at 291; *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55–56 (1996); *Dellmuth*, 491 U.S. at 230.

18

not discussed in the floor debates, could not be subject to the FCRA's substantive requirements, which it clearly is.

C.

The District Court in this case was persuaded to follow the Fourth and Ninth Circuits, each of which held that Congress needed to be even clearer to meet the standard set by other, more specific, waivers of sovereign immunity. It goes without saying, though, that some waivers of sovereign immunity will be more explicit than others. And the Supreme Court has been clear that "Congress need not state its intent in any particular way," and that we may not impose any "magic words" requirement. *Cooper*, 566 U.S. at 291. Thus, while other waivers of sovereign immunity may provide helpful points of reference, they do not dictate the manner in which Congress must convey its intent, nor can they inject ambiguity into otherwise clear text.

The Fourth and Ninth Circuits placed great emphasis on a second, more specific waiver of sovereign immunity within the FCRA itself. Section 1681u requires credit reporting agencies to disclose certain credit information to the Federal Bureau of Investigation for counterintelligence purposes and permits the FBI to disseminate that information to other federal agencies subject to specific requirements. *See* 15 U.S.C. § 1681u(a)–(b), (g). Where the FBI or "[a]ny agency or department of the United States" fails to comply with requirements on its use of consumers' credit information, § 1681u(j) imposes statutory, actual, and punitive damages. *Id.* § 1681u(j). Contrasting the explicit reference to the United States in this waiver with the terms of §§ 1681n and 1681o, these Courts reasoned that Congress intended to waive

19

sovereign immunity only in the former. *See Robinson,* 917 F.3d at 803-04; *Daniel*, 891 F.3d at 771–72.

We are not persuaded. As the D.C. Circuit correctly observed, "there is a good reason why [§ 1681u(j)] specifically targets federal agencies," which is that only federal agencies are subject to § 1681u's substantive requirements in the first place. *Mowrer*, 14 F.4th at 729. In contrast, §§ 1681n and 1681o concern requirements that apply not merely to the government but to "persons" generally, so it makes sense to employ the broader term rather than enumerate specific entities already encompassed by the statutory definition.

The Fourth and Ninth Circuits also contrasted §§ 1681n and 1681o with other waivers in other statutes that specifically authorize suits against the United States. *See Robinson*, 917 F.3d at 803; *Daniel*, 891 F.3d at 772–73. The Federal Tort Claims Act ("FTCA"), for instance, provides that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. Likewise, the Clean Water Act ("CWA") provides that "any citizen may commence a civil action . . . against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency . . .)." 33 U.S.C. § 1365(a), (a)(1).

Again, however, there are reasonable explanations for why each of these waivers lists the United States specifically. The FTCA, like § 1681u(j) of the FCRA, only applies to the federal government, so there is no need to name any other entity as liable. And the CWA's definition of "person," unlike the FCRA's, only includes state and municipal governments, meaning that the United States would not otherwise be

20

included in the Act's waiver if it were not specifically included. *See* 33 U.S.C. § 1362(5).

The last group of comparators on which the Fourth and Ninth Circuits rely are those that explicitly reference the federal government not only in defining the potential defendants but again in imposing liability. The Resource Conservation and Recovery Act ("RCRA"), for instance, defines the term "person" to "include each department, agency, and instrumentality of the United States," but also includes additional language in its liability provision authorizing suits "against any person, including (a) the United States, and (b) any other governmental instrumentality or agency . . . ." 42 U.S.C. §§ 6903(15), 6972; *see also Robinson*, 917 F.3d at 803; *Daniel*, 891 F.3d at 771 n.5. Likewise, the USDA points to the Family and Medical Leave Act ("FMLA") and the Age Discrimination in Employment Act ("ADEA"), each of which defines "employer" to include any "public agency," 29 U.S.C. §§ 2611(4), 203(d)—a term expressly defined to encompass the federal government, *see* 29 U.S.C. § 2611(4) [12]—before imposing civil liability on "any employer (including a public agency)," 29 U.S.C. §§ 2617(a)(2), 216(b). While the USDA contends that these statutes, with their built-in redundancies, should set the standard for the FCRA's waiver, that would impose the exact sort of "magic words" requirement that the Supreme Court has long rejected. *See Cooper*, 566 U.S. at 291. Even more troubling, the USDA's approach would require that

---

[12] Both statutes incorporate by reference the definition of "public agency" under 29 U.S.C § 203(x), which includes "the Government of the United States; the government of a State or political subdivision thereof; [and] any agency of the United States . . . ."

21

Congress employ "magic words" that are superfluous and duplicative of an express statutory definition. Certainly, Congress is free to repeat itself for good measure, as it did in the FMLA, ADEA, and RCRA, but we will not require it to do so.

In sum, none of the more explicit waivers cited by the USDA or invoked by the Fourth or Ninth Circuits call into question the clarity with which Congress spoke in the 1996 Amendments.

D.

In departing from the FCRA's plain text, the Fourth and Ninth Circuits assumed that treating the government as a "person" for purposes of the FCRA's civil liability provisions would require doing so in every other provision of the statute, including those that subject "persons" to punitive damages, 15 U.S.C. § 1681n(a)(2), criminal liability, *id.* § 1681q, and civil enforcement actions by the Federal Trade Commission, *id.* § 1681s(a), and the states, *id.* § 1681s(c). This, according to these sister Circuits, would lead to a parade of implausible and untenable results. *See Robinson*, 917 F.3d at 804–05; *Daniel*, 891 F.3d at 770–71.

Marshaling that parade, however, is a legal bogeyman. Courts have never been required to choose between mechanically applying a statutory definition everywhere in a statute or applying it nowhere. To the contrary, the Supreme Court has repeatedly held that where a statute contains an "express definition," that definition is "virtually conclusive" and must be applied for all purposes "[s]ave for some exceptional reason." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) (internal quotation marks omitted). These reasons

22

include circumstances where applying a definition to a specific provision would be unconstitutional, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73–74, 91 (2000) (declining to apply the ADEA's definition of "public agency" to unconstitutionally abrogate state sovereign immunity), where it would be absurd, *see Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510 (1989) (declining to apply the plain text of Federal Rule of Evidence 609(a) in a way that "would deny a civil plaintiff the same right to impeach an adversary's testimony that it grants to a civil defendant"), or where it would be "incompatible" with Congress's regulatory scheme, *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319–20 (2014) (declining to apply a broad definition of the term "air pollutant" in the Clean Air Act where doing so would render the EPA's regulatory scheme unworkable).

When it comes to sovereign immunity, it is understandable and entirely appropriate that the District Court was wary of implausible results and cautious about exposing the public fisc to liability. But even exceptional circumstances justify departing from a statutory definition only to the extent necessary to avoid untenable—not merely implausible—results. For all other provisions of a statute, courts must continue to apply statutory terms as defined. With this standard in mind, we consider the two categories of purportedly "untenable" applications of the term "person" that led the Fourth and Ninth Circuits to reject the FCRA's statutory definition.

1.

One category of potentially problematic applications is those that appear untenable on their face, but which can be reconciled with the statute without rejecting its definition

wholesale by using well-established canons of statutory construction.

Section 1681q, for instance, imposes criminal penalties, including fines and imprisonment, on any "person" who knowingly obtains credit information under false pretenses. It would be absurd, however, to subject the federal government to criminal prosecution, not to mention the impossibility of imprisoning a government entity.[13]  *See United States v. Cooper Corp.*, 312 U.S. 600, 606–07 (1941) (holding that a provision of the Sherman Act imposing criminal penalties on "person[s]" could not "embrace the United States"); *United States v. Singleton*, 165 F.3d 1297, 1300 (10th Cir. 1999) (imposing criminal penalties on the United States government is "patently absurd"); *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991) ("[I]t is self-evident that a federal agency is not subject to state or federal criminal prosecution."). The canon against absurdity thus leans against applying the FCRA's definition of "person" to this provision.

Similarly, a court could not interpret the term "person" as used in §§ 1681n and 1681o as authorizing suits against state

---

[13] The Seventh Circuit in *Bormes* viewed the FCRA's criminal liability provisions as unproblematic because it interpreted them as authorizing criminal prosecutions only against federal employees. *See Bormes*, 759 F.3d at 796. But as the Ninth Circuit correctly observed, a faithful application of the FCRA's definition "would read 'the United States' into the FCRA's enforcement provisions, not 'federal employees.'" *Daniel*, 891 F.3d at 770. For the reasons we explain, however, whether the FCRA's definition of "person" may be applied to § 1681q is immaterial to whether it may be applied to §§ 1681n and 1681o.

24

governments without running afoul of the Eleventh Amendment and principles of state sovereign immunity, which prohibit Congress from abrogating state sovereign immunity under its Commerce Clause authority. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72–73 (1996). And from that, the Fourth Circuit reasoned that Congress could not have intended for those provisions to waive the federal government's immunity either. *See Robinson*, 917 F.3d at 805. We see it differently. There is no constitutional bar to Congress waiving the *federal* government's sovereign immunity in the FCRA, so regardless of how *Seminole Tribe* affects state sovereign immunity under the statute, it does not allow us to impute a statutory bar in derogation of the statutory text.

To the contrary, doing so would disregard the central tenet of *Seminole Tribe* and conflate Congress's intent with its power. In *Seminole Tribe*, the Supreme Court clearly distinguished between two distinct inquiries—(1) whether Congress has unequivocally expressed its intent to waive immunity, and (2) whether Congress has acted pursuant to a valid grant of authority, *see* 517 U.S. at 55—and addressed each independently. It concluded that while Congress clearly intended to abrogate state immunity, it lacked the power to do so. *See id.* at 56–57, 72–73. Here, however, the plain text of §§ 1681n and 1681o clearly expresses Congress's intent to authorize suits against both the federal and state governments, and under *Seminole Tribe* we cannot infer from Congress's lack of authority under the Commerce Clause an intent to preserve state immunity, let alone federal immunity. *See id.* at 55–57, 72.

Indeed, that inference has been resoundingly rejected by the Supreme Court. In *Kimel*, the Court applied *Seminole*'s twin inquiries to the ADEA, which subjects "public agencies"

25

to civil damages. *See* 528 U.S. at 78, 29 U.S.C. §§ 203(d), 203(x), 216(b). On the second prong, the Court concluded, as in *Seminole Tribe*, that Congress lacked authority to abrogate state sovereign immunity. *See* 528 U.S. at 91. But that conclusion did not negate the Court's holding as to the first prong that Congress had clearly expressed its intent to do so by authorizing suits against "public agencies," a term defined to include state agencies. *See id.* at 73-74. The same holds true for the FCRA; whether Congress intended to abrogate state sovereign immunity does not turn on whether it had authority to do so. And where there is no constitutional bar to waiving federal sovereign immunity, there is even less reason to question the FCRA's plain text.

2.

The other category of applications that concerned the Fourth and Ninth Circuits are those that would produce results that may be implausible, but which, ultimately, are not untenable.

For example, there is a "presumption against [the] imposition of punitive damages on governmental entities," *Vt. Agency*, 529 U.S. at 785, but that presumption, like sovereign immunity, may be overcome by a clear expression of Congress's intent, *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263–64 (1981). Section 1681n(a)(2) meets that standard.

Similarly, while Congress has only rarely expressed its intent to subject the United States and its agencies to enforcement actions brought by administrative agencies and states, neither is unprecedented. RCRA, for instance, authorizes the Environmental Protection Agency to bring

26

enforcement actions against other federal agencies, *see* 42 U.S.C. §§ 6928(a)(1) (authorizing civil actions by the EPA Administrator), 6972(a)(1) (authorizing civil actions against any "person," including the United States and its agencies), and both RCRA and the CWA permit states, as "persons," to bring actions against the federal government as well, *see id.* §§ 6972(a)(1) (authorizing suits against the United States by "any person"), 6903(15) (defining "person" to include States); 33 U.S.C. §§ 1365(a)(1) (authorizing suits against the United States by "any citizen"), 1365(g) (defining "citizen" as "a person"), 1362(5) (defining "person" to include States). The Fourth and Ninth Circuits did not identify any principle, constitutional or otherwise, that would preclude Congress from adopting a similar enforcement mechanism for the FCRA. They held only that it would be "implausible" or "anomalous" for Congress to do so without being more explicit. *See Robinson*, 917 F.3d at 805; *Daniel*, 891 F.3d at 770–71. We are aware of no principle of law, however, that requires Congress to express its intent to authorize administrative or state enforcement in a particular way beyond a clear statement.[14]

---

[14] The closest the USDA comes to identifying such a principle is its reference to the Supreme Court's decision in *Library of Congress v. Shaw*, 478 U.S. 310 (1986). In that case, the Court applied the longstanding principle, dating from common law, that even where Congress has waived the United States' immunity, "interest cannot be recovered unless the award of interest was affirmatively and separately contemplated by Congress." *Id.* at 315. That principle, however, is not implicated in this case.

In sum, there are two provisions for which applying the FCRA's definition of "person" would lead to untenable results and a handful for which the results would be merely unusual, but none ultimately precludes our application of that definition to the civil liability provisions at issue here.[15]

---

[15] The USDA argues that if a statutory term cannot be applied as defined to every part of a statute, that term is ambiguous. *See also Robinson*, 917 F.3d at 805 ("The pro-waiver camp cannot have it both ways—literal most often, just not when it suits to blur the lines."). This argument, however, confuses ambiguity with applicability. The term "person" as defined in the FCRA remains unambiguous, even if exceptional reasons counsel against applying it in a particular instance. Moreover, the USDA's all-or-nothing approach is inconsistent with cases in which the Supreme Court has declined to apply a statutory definition without calling into question its unambiguous meaning. *See, e.g.*, *Util. Air*, 573 U.S. at 319–20 (recognizing that the term "air pollutant" in the Clean Air Act was defined broadly enough to include greenhouse gases but declining to apply it where doing so would lead to unworkable results); *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 206–11 (2009) (recognizing that the term "political subdivision" in the Voting Rights Act unambiguously excluded certain districts that did not conduct their own voter registration but declining to apply that definition where doing so would frustrate the Act's purpose); *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 312–16 (1953) (recognizing that the term "person" under the Federal Power Act unambiguously excluded municipalities but declining to apply that definition in a way that would frustrate

3.

The upshot of that discussion is that we see no exceptional reason that absolves us of our duty to apply the FCRA's definition to §§ 1681n and 1681o. There is no constitutional impediment to Congress waiving the United States' sovereign immunity, and it is certainly not absurd for Congress to do so. Nor would waiving the federal government's immunity be "incompatible" with the FCRA's enforcement scheme or "destroy" the statute's major purposes. *Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 778 (2018) (first quoting *Util. Air*, 573 U.S. at 322 and then quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949)). To the contrary, one of the FCRA's express findings is that the banking system depends on "fair and accurate credit reporting," 15 U.S.C. § 1681(a)(1), and authorizing enforcement against the federal government—the nation's largest employer and creditor—is a reasonable means of furthering that goal.[16]

The closest the Fourth and Ninth Circuits come to identifying a reason not to apply the FCRA's express definition of "person" to the civil liability provisions is their observation that waiving immunity for FCRA claims would expose the federal fisc to potential liability. *See Robinson*, 917 F.3d at

the Act's purposes by depriving municipalities of the right to complain and petition).

[16] We need not resolve here whether Congress in fact chose to waive sovereign immunity specifically to further any particular end; it suffices that waiver is not incompatible with the FCRA's purposes. *Cf. Digit. Realty*, 138 S. Ct. at 778.

804; *Daniel*, 891 F.3d at 775–76. But this is true whenever Congress decides to waive immunity for damages claims and is certainly not an exceptional reason to depart from Congress's clear intent. Whether to subject the federal fisc to liability is a policy choice reserved to Congress and one that we are bound to honor, not second-guess. *See Doe*, 37 F.4th at 88 (emphasizing that the clear-statement rule for finding a waiver of sovereign immunity "ensures that elected officials, not judges, choose when to open the public purse").

E.

The USDA also directs our attention to the Seventh Circuit's decision in *Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 826 (7th Cir. 2016), which held that the FCRA did not unambiguously abrogate tribal sovereign immunity,[17] and suggests that the court has backed away from its position in *Bormes*. The Fourth and Ninth Circuits likewise viewed *Meyers* as a retreat. *See Robinson*, 917 F.3d at 806–07; *Daniel*, 891 F.3d at 774.

We disagree. As the Seventh Circuit correctly explained in *Meyers*, there are important differences between waiver of the federal government's own immunity and abrogation of Indian tribes' inherent sovereignty that warrant different analyses. *See Meyers*, 836 F.3d at 826–27. Indian tribes are "'domestic dependent nations' that exercise inherent

---

[17] Technically, the Seventh Circuit was analyzing whether the Fair and Accurate Credit Transaction Act ("the FACTA") waived tribal immunity. *See Meyers*, 836 F.3d at 819–20. The FACTA amended the FCRA in 2003 and employs the same statutorily-defined term "person" in its civil liability provision. *See* 15 U.S.C. § 1681a(b), c(g)(1).

sovereign authority[.]" *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831)). Congress, however, may abrogate that sovereignty at any time pursuant to its plenary authority over tribes. *See, e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014).

But Indian tribes are not vassal states, nor is the United States an empire. Rather, Congress is presumed to legislate for the benefit of Indian tribes, with all statutory language "'construed liberally in favor of the Indians'" and any "'ambiguous provisions interpreted to their benefit.'" *Ysleta Del Sur Pueblo v. Texas*, 142 S.Ct. 1929, 1941 n.3 (2022) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)); *see also McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 174–75 (1973); *Choate v. Trapp,* 224 U.S. 665, 675 (1912). This canon of interpretation is robust and displaces rules that would otherwise govern outside the Indian law context. *See, e.g.*, *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009) (explaining that the Indian canons "trump[]" and "mute[]" the application of *Chevron* deference) (internal quotation marks omitted). For this reason, too, Congress must speak with particular clarity when it chooses to abrogate tribal sovereign immunity. *See, e.g.*, *Bay Mills*, 572 U.S. at 788–90. Application of these unique canons of construction would thus require us to not only identify a clear statement from Congress, but also to pause and consider whether Congress believed that waiving tribal immunity under the FCRA would have inured to tribes' benefit, an inquiry that may perhaps require specificity beyond that required to waive the United States' immunity. *See* Justin W. Aimonetti, *"Magic Words" and Original Understanding: An Amplified Clear Statement Rule*

*to Abrogate Tribal Sovereign Immunity*, 2020 Pepp. L. Rev. 1, 29–34 (2020).

Even applying the ordinary rules of statutory construction, however, it is not clear that Congress intended to abrogate tribal immunity. It is indisputable that the United States is a "government" within the FCRA's definition, as evidenced by those provisions that explicitly treat "person" as including the federal government. *See* 15 U.S.C. §§ 1681a(y)(1)(D)(ii), 1681b(b). In contrast, there is not a single mention of either "Indians" or "tribes" anywhere in the FCRA's text, let alone any provision that specifically treats tribes as "persons."

This is significant; as the Seventh Circuit correctly noted, "there is not one example in all of history where the Supreme Court has found that Congress intended to abrogate tribal sovereign immunity *without* expressly mentioning Indian tribes somewhere in the statute." *Meyers*, 836 F.3d at 824 (quoting *In re Greektown Holdings, LLC*, 532 B.R. 680, 693 (E.D. Mich. 2015)) (emphasis in original). Thus, even if Indian tribes are "governments,"[18] we have no textual basis from

---

[18] Though we need not decide the issue, we note that the unique status of Indian tribes may not map neatly onto the term "government" as used in the FCRA. While "the Supreme Court has referred to Indian tribes as 'sovereigns,' 'nations,' and even 'distinct, independent political communities, retaining their original natural rights,'" it has never equated them with the federal and state "governments." *In re Whitaker*, 474 B.R. 687, 695 (8th Cir. 2012). As such, the term "government" itself may be ambiguous with respect to Indian tribes, in which case that ambiguity must be resolved in favor of tribal immunity.

which to conclude that Congress ever contemplated them as such for purposes of the FCRA. This ambiguity, which is not present with respect the United States, requires that we construe the FCRA in favor of tribal immunity. *Cf. Meyers*, 836 F.3d at 826 ("[I]t is one thing to read 'the United States' when *Congress* says 'government.' But it [is] quite another . . . to read 'Indian tribes' when Congress says 'government.'" (internal quotation marks omitted) (emphasis in original)).

In short, the Seventh Circuit's decisions in *Bormes* and *Meyers* are in perfect harmony given the unique status of Indian tribes, the special rules of construction that apply in the Indian law context, and the complete lack of any reference to Indian tribes in the FCRA.

F.

Finally, the USDA contends that construing "person" to include the federal government would expand the United States' liability beyond that provided for by the Privacy Act of 1974, codified at 5 U.S.C. § 552a, which also regulates information about individuals contained within systems of records maintained by federal agencies including, in some cases, consumer credit information.[19] Where a federal agency fails to correct inaccurate information on an individual, the Privacy Act allows for injunctive relief, but not money

---

[19] Similar arguments based on the Privacy Act were raised in *Bormes*, *Daniel*, and *Robinson*. Although none of these courts discussed those arguments in their opinions, we address the issue here for the sake of completeness and for the benefit of courts that may be presented with this same argument in the future.

damages unless the failure is "intentional or willful." 5 U.S.C. § 552a(g)(1), (4). The USDA's argument, in short, is that construing the 1996 FCRA amendments to allow for money damages without proof of intentional or willful conduct would upset the careful balance struck by the Privacy Act.

We find this argument unpersuasive for two reasons. First, the Privacy Act's remedial scheme in no way limited Congress's ability, more than two decades later, to revisit an area of perceived need. To the contrary, it would have been quite reasonable for Congress, in enacting the 1996 FCRA amendments, to find that the Privacy Act's remedial scheme, with its strict limit on money damages, was insufficient to ensure the accuracy of consumer credit information. In any event, the mere fact that the 1996 FCRA amendments struck a balance that may be inconsistent with the Privacy Act is no reason to set aside clear statutory text.

Second, USDA has not identified any actual inconsistency between the Privacy Act and the 1996 amendments. No doubt, there is some overlap between the information covered by the two statutes, as the Privacy Act addresses any information on an individual that is maintained in a system of records maintained by a federal agency, *see* 5 U.S.C. § 552a(a)(4), which may include some consumer credit information, as is the case with the system of records maintained by the USDA Rural Housing Service, *see* 81 Fed. Reg. 25369 (Apr. 28, 2016); 63 Fed. Reg. 38546 (Aug. 17, 1998). And the FCRA and the Privacy Act also both provide a way to request correction of inaccurate information and require that notice of any correction be sent to any "person" to whom the inaccurate information was given. *See* 15 U.S.C. § 1681s-2(b)(1) (requiring a federal agency, as a "person," to respond to notification from a consumer reporting agency of a

34

dispute, to conduct a reasonable investigation, to correct any inaccurate information, and then to report the correction to both the consumer reporting agency that notified the agency of the dispute, but also any other consumer reporting agencies to which the inaccurate information was also provided); *See* 5 U.S.C. § 552a(c)(4) (requiring federal agencies to "inform any person or other agency" to which disputed information was previously disclosed "about any correction" made).[20]

But there the overlap ends. For one thing, the government's duties to correct inaccurate information under both statutes are triggered by different events. Under § 1681s-2 of the FCRA, these duties are triggered only upon receiving notice from a consumer reporting agency of disputed information; notice from an individual is insufficient. In contrast, the government's duty to amend a record under the Privacy Act, may *only* be triggered by a request from an individual. *See* 5 U.S.C. § 552a(d). For another, the two statutes impose liability on federal agencies in different ways. Under the FCRA, a federal agency is liable for any failure to comply with the Act's substantive requirements, *see* §§ 1681n, 1681o, whereas under the Privacy Act, an individual may only seek civil damages for failure to correct inaccurate information

---

[20] The USDA reads the term "agency" in 5 U.S.C. § 552a(c)(4) to include credit reporting agencies, but this is inaccurate, as the Privacy Act explicitly defines "agency" to include only government agencies and government corporations. *See* 5 U.S.C. §§ 552a(a)(1), 552(f)(1), 551(1). Credit reporting agencies are covered as "persons" under this provision, as § 551(2) defines "person" to include any "individual, partnership, corporation, association, or public or private organization other than an agency.".

if that failure leads to a determination adverse to the individual, 5 U.S.C. §§ 522a(g)(1)(C)–(D), 522a(g)(4).  These important differences reinforce our view that the Privacy Act provides no obstacle to reading "person" in the FCRA to include the federal government.

III.

For the foregoing reasons, we will reverse the judgment of the District Court and remand for further proceedings not inconsistent with this opinion.